**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:10-cv-00257-MR-DLH**

STELLA ANDREWS, individually and )
on behalf of similarly situated )
persons, )
              )
            **Plaintiff,** )     <u>**MEMORANDUM OF**</u>
              )     <u>**DECISION AND ORDER**</u>
       **vs.** )
              )
AMERICA'S LIVING CENTERS, LLC, )
et al., )
              )
           **Defendants.** )
_____ )

       **THIS MATTER** is before the Court on the Plaintiff's Motion for Default

Judgment [Doc. 77].

## I.    PROCEDURAL BACKGROUND

       The Plaintiff Stella Andrews first filed suit on June 4, 2010, against the

Defendants America's Living Centers, LLC ("ALC") and Kenneth Hodges

("Hodges") (collectively, "Defendants"),[1] asserting claims under the Fair

_____

[1] The Plaintiff brings suit against ALC "doing business as" the ten residential facilities that ALC allegedly owned/operated: Carolina Living Center; Carolina Living Center #1, Zion Hill Living Center, Golden Harvest Living Center #1, Golden Harvest Living Center #2, Union Mills Living Center #1, Union Mills Living Center #2, Union Mills Living Center #3, Four Seasons Family Care Home, and Transylvania Living Center.  Hodges is sued in both his individual capacity and in his capacity as the sole member/manager of ALC and the owner and/or manager of the various ALC facilities.  [<u>See</u> Doc. 1 at ¶¶ 7-38].

Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.* ("FLSA"). [Civil Case No. 1:10-cv-00114-MR-DLH, Doc. 1]. On July 29, 2010, the Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Id., Doc. 15]. Before the motion was ruled on, the Plaintiff decided to voluntarily dismiss her action pursuant to Federal Rule of Civil Procedure 41(a)(1), and she immediately filed the present action. [Doc. 1]. Shortly after the Plaintiff re-filed her action, three additional employees -- Betty Dean Gosnell, Sheila Annette Barnard, and Sherry Marie Hensley -- filed notices indicating their consent to opt in and become party plaintiffs. [Docs. 20, 23].

The Defendants moved to stay this action pending the Plaintiff's payment of costs of the prior action pursuant to Federal Rule of Civil Procedure 41(d). [Doc. 26]. The Court granted the Defendants' motion and ordered the Plaintiff to pay an award of attorneys' fees and other expenses that had been incurred by the Defendants in defending the first action. [Docs. 30, 36].

The Plaintiff appealed to the Court of Appeals. That appeal was dismissed because the amount of the award had yet to be determined. [Doc. 41]. On remand, this Court awarded $13,403.75 in attorneys' fees to the Defendants and stayed the case pending payment. [Doc. 50]. The Plaintiff

did not pay the costs, but before the case was dismissed for nonpayment, she filed a second appeal. [Doc. 51]. After oral argument before the Fourth Circuit, the Plaintiff moved to voluntarily dismiss the appeal, which motion was granted. [Doc. 57]. In the interim, counsel for the Defendants moved to withdraw. This motion was granted on May 22, 2015, leaving both Defendants unrepresented. [Docs. 61, 62].

On June 10, 2015, the Court dismissed this action for failure of the Plaintiff to pay the awarded attorneys' fees. [Doc. 63]. The Plaintiff then appealed for a third time. On June 28, 2016, the Court of Appeals vacated the award of attorneys' fees and remanded the case for further proceedings. [Doc. 69]. The Court of Appeals' mandate issued on July 20, 2016. [Doc. 70].

Following the last remand, none of the Defendants filed an Answer. The Plaintiff, however, made no effort to prosecute the case. On August 24, 2016, the Court ordered the Plaintiff to file an appropriate motion or otherwise take further action with respect to each Defendant within fourteen (14) days of entry of the Order, or the Court would dismiss this action. [Doc. 71]. The Plaintiff subsequently moved for an entry of default against the Defendants. [Doc. 75]. On September 7, 2016, the Clerk entered default against the Defendants. [Doc. 76]. On September 20, 2016, the Plaintiff filed the

present motion for default judgment on behalf of herself and the "opt-in" plaintiffs. [Doc. 77]. In her motion, the Plaintiff specifically requested that the Court not set an evidentiary hearing. Instead, the Plaintiff requested a period of sixty (60) days to assemble the necessary documentation to support her and the "opt-in" plaintiffs' claims for damages. [Doc. 77 at 2]. The Plaintiff filed a supplemental memorandum and supporting documentation in support of her claims and that of opt-in plaintiff Betty Gosnell[2] on November 22, 2016. [Doc. 78].

This matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of a default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Once a defendant has been defaulted, the plaintiff may then seek a default judgment. If the plaintiff's claim is for a sum certain or can be made certain by computation, the Clerk of Court may enter the default judgment. Fed. R.

---

[2] The Plaintiff indicated in her Memorandum that she was unable to locate the two other opt-in plaintiffs and therefore no additional documentation was submitted in support of their claims. [Doc. 78 at 1 n.1].

Civ. P. 55(b)(1). In all other cases, the plaintiff must apply to the Court for a default judgment. Fed. R. Civ. P. 55(b)(2).

"The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact . . . ." Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001) (quoting Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)). A defendant, however, "is not held . . . to admit conclusions of law." Ryan, 253 F.3d at 780 (quoting Nishimatsu, 515 F.2d at 1206). The Court therefore must determine whether the facts as alleged state a claim. GlobalSantaFe Corp. v. Globalsantafe.com, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).

## III.   PLAINTIFF'S FACTUAL ALLEGATIONS

The well-pleaded factual allegations of the Plaintiff's Complaint having been deemed admitted by virtue of the Defendants' default, the following is a summary of the relevant facts.

The Plaintiff was employed as a "Supervisor in Charge" at the Transylvania Living Center ("TLC"), one of multiple "family care homes"[3]

---

[3] North Carolina law defines a "family care home" as "[a]n adult care home having two to six residents." N.C. Gen. Stat. § 131D-2.1(9). An "adult care home" is defined as "[a]n assisted living residence in which the housing management provides 24-hour scheduled and unscheduled personal care services to two or more residents, either directly or for scheduled needs, through formal written agreement with licensed home care or hospice agencies." N.C. Gen. Stat. § 131D-2.1(3).

owned and operated by the Defendants, from January 15, 2006 to June 30, 2009. [Complaint, Doc. 1 at ¶¶ 5-6, 80; Declaration of Stella Andrews ("Andrews Decl."), Doc. 78-1 at ¶ 14].[4]

As the sole member/manager of ALC, Hodges exercised complete control over all compensation, policy, and personnel decisions for ALC. [Id. at ¶¶ 61, 74-78]. Hodges personally signed many of the checks issued to the Plaintiff for payroll, for expenses that she incurred when she was required to purchase household goods for the facility, and for reimbursement to the Plaintiff for the payment of utility bills that the Plaintiff paid out of her account on the promise that she would be reimbursed for such expense. The checks signed by Hodges were written from an account under the name of "Hodges & Associates." [Id. at ¶ 60].

Although the Plaintiff's job title was that of "Supervisor in Charge," she did not have any authority to supervise, fire, or hire other employees or to enter into contracts with third parties on behalf of the Defendants. [Id. at ¶¶ 91, 93-95]. Rather, the Plaintiff's job duties were defined in writing, and a

---

[4] In the Complaint, which is not verified, the Plaintiff alleges that she was employed from January 15, *2007* to June 30, 2009. [Doc. 1 at ¶ 6]. The sworn Declaration submitted in support of her claim for damages, however, indicates that the Plaintiff was employed from January 15, *2006* to June 30, 2009. [Doc. 78-1 at ¶ 14]. The Court will use the dates from the Plaintiff's sworn Declaration in calculating her damages.

manual maintained on site set forth procedures for the day-to-day operation of the facility.  [Id. at ¶¶ 92, 97].  Deviation from these procedures carried the threat of disciplinary action by the Defendants.  [Id. at ¶ 98; Andrews Decl., Doc. 78-1 at ¶ 12].   The Plaintiff's job duties included: (1) keeping track of the expenses of the home to which she was assigned; (2) paying bills when cut off notices were received in the mail for the home to which she was assigned; (3) purchasing groceries and household supplies for the home; (4) notifying ALC of the need for maintenance at the home to which she was assigned; (5) assisting with the intake of new clients; (6) preparing meals for those clients residing at the home to which she was assigned; (7) performing housekeeping duties in the home to which she was assigned; (8) doing laundry for the clients assigned to her care; (9) preparing medications (four or more times a day) for the clients assigned to her; (10) distributing such medication; (11) tracking the inventory of such medication; (12) maintaining records of the distribution of each client's medication; (13) contacting the appropriate pharmacy or physician to ensure an adequate supply of medication was on hand for each client; (14) transporting clients to physician appointments and/or social functions when transportation was not available from ALC; and (14) coordinating clients' doctor and all service providers' appointments.  [Doc. 1 at ¶ 82].   The Plaintiff estimates that she spent

between thirty percent (30%) and fifty percent (50%) of her time per week on domestic duties, such as cooking, cleaning, laundry, transporting residents, and administering medications. [Id. at ¶ 104].

In order to perform her duties of providing care to the residents of TLC, the Plaintiff was required to reside at the facility. [Id. at ¶ 86]. She had to provide her own substitute in the event that she needed to leave TLC. [Id. at ¶¶ 88-89]. She was on duty twenty-four hours a day, seven days a week, and was regularly awakened during the night to administer medication to residents or to prevent residents from leaving the facility without permission. [Id. at ¶¶ 87, 108, 109]. As a result, the Plaintiff rarely received more than five hours of uninterrupted sleep on any given night. [Id. at ¶ 111]. No agreement existed between the Plaintiff and the Defendants regarding the Plaintiff's sleep, rest, or meal periods. [Id. at ¶¶ 107, 110].

During her employment, the Plaintiff was classified as an independent contractor and was paid a straight salary of between $500 and $600 per week. [Id. at ¶¶ 83-84, 118]. The Plaintiff's salary did not vary, regardless of how many hours she worked or whether she was on duty. [Id. at ¶ 116]. When the Plaintiff requested an IRS Form 1099 from the Defendants, she was told to create her own document. [Id. at ¶ 115].

Due to the Defendants' failure to pay her minimum wage and overtime as required by the FLSA, the Plaintiff calculates that she was underpaid by $86,044.08 over the course of her employment. [Doc. 78 at 1]. She seeks that amount in compensatory damages and an equal amount of liquidated damages. [Id. at 2]. She also seeks an award of $45,496.23 in attorneys' fees and costs. [Id. at 3].

## III. DISCUSSION

### A. Claims of the Opt-In Plaintiffs

The Plaintiff brought this suit for violations of the FLSA's minimum wage and overtime requirements on behalf of herself as well as "all other similarly situated employees." [Doc. 1 at ¶ 39]. FLSA collective actions are distinct from Rule 23 class actions in that class members in a FLSA collective action must affirmatively "opt-in," that is, consent to become parties to the action. See 29 U.S.C. § 216(b).

In order for other employees to join a FLSA action, the Court must certify the collective action. Courts generally follow a two-step process to certify a collective action under the FLSA. First, at the notice stage, the court may conditionally certify the class and direct that notice be given to potential class members so that they may opt in. Purdham v. Fairfax Cty. Pub. Schs., 629 F. Supp. 2d 544, 547 (E.D. Va. 2009), aff'd, 637 F.3d 421 (4th Cir. 2011);

<u>Parker v. Rowland Express, Inc.</u>, 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007). Once members have opted in and substantial discovery has been completed, the court can then make a factual determination as to whether the collective action members are "truly 'similarly situated.'" <u>Purdham</u>, 629 F. Supp. 2d at 547; <u>Parker</u>, 492 F. Supp. 2d at 1164.

Here, there was no certification, conditional or otherwise, of any collective action prior to the entry of default against the Defendants, and the Plaintiff did not move for a certification of the collective action with her motion for default judgment. <u>See</u> <u>Davis v. Precise Commc'n Servs., Inc.</u>, No. 1:07-CV-3128-JOF, 2009 WL 812276, at *1 (N.D. Ga. Mar. 27, 2009) (noting that conditional certification was still required despite defendant's default). Because no determination has been made that the proposed members of the collective action are "similarly situated," an entry of a default judgment, if appropriate at all, is proper only as to the named Plaintiff, Stella Andrews. <u>See id.</u>; <u>see also</u> <u>Partington v. Am. Int'l Specialty Lines Ins. Co.</u>, 443 F.3d 334, 340 (4th Cir. 2006) (where class not certified under Fed. R. Civ. P. 23, default judgment order binds only named plaintiffs and not putative class members); <u>Skeway v. China Nat. Gas, Inc.</u>, 304 F.R.D. 467, 472 (D. Del. 2014) ("in cases in which the district courts have entered a default judgment against a defendant and no class has been certified [under Fed. R. Civ. P.

23], only named plaintiffs can recover damages"). Accordingly, the Court will dismiss the claims of the putative collective action members without prejudice and will address the motion for default judgment with respect to the claims of the Plaintiff Stella Andrews only.

### B.    Plaintiff's FLSA Claims

The Plaintiff asserts claims for unpaid minimum wages and unpaid overtime compensation under the FLSA, 29 U.S.C. §§ 206, 207. The FLSA requires covered employers to pay their employees a minimum wage, which is currently set at $7.25 per hour. 29 U.S.C. § 206(a). Covered employers also must also pay their employees an overtime rate of 1½ times the regular rate of pay for each hour worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1).

In order to determine whether the Plaintiff has adequately stated a claim under the FLSA for unpaid minimum wage and overtime compensation, the Court first must determine whether the named Defendants are "employers" subject to the provisions of the FLSA. Assuming the Defendants are covered employers, the Court must then determine whether the Plaintiff is an "employee" who is not otherwise exempt from FLSA protection. The Court will address each of these issues in turn.

**1.    Are the Defendants' Plaintiff's "Employers"?**

The Plaintiff alleges that both Hodges and ALC qualify as her "employer."

The FLSA defines "employer" broadly to include "any person" other than a labor organization who "act[s] directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  An individual may be liable for FLSA violations, despite the corporate structure of the employing business, if the individual had extensive managerial responsibilities and "substantial control of the terms and conditions of the work of [plaintiff] employees."  Falk v. Brennan, 414 U.S. 190, 195 (1973); see also Brock v. Hamad, 867 F.2d 804, 808 n.6 (4th Cir. 1989) (imposing FLSA liability on individual who "hired and directed the employees who worked for the enterprise"); Bonham v. Wolf Creek Acad., 767 F. Supp. 2d 558, 571 (W.D.N.C. 2011) (noting that "veil piercing" is not required to attach FLSA liability to an individual behind a corporate employer).  Here, the Plaintiff's factual allegations, which are deemed admitted, are sufficient to establish that Hodges was the sole member/manager of ALC and thus controlled all aspects of the business, including all personnel decisions.  As Hodges had "substantial control" over the terms and conditions of the Plaintiff's employment, Falk, 414 U.S. at 195, the Court concludes that the Plaintiff has

established that both Hodges and ALC were her "employers" for the purpose of imposing FLSA liability.

Having determined that both Defendants employed the Plaintiff, the Court now turns to whether her employers are covered by the FLSA. To recover for minimum wage or overtime violations under the FLSA, a plaintiff must show that either (1) her employer is an "enterprise engaged in commerce or in the production of goods for commerce" or (2) the plaintiff herself has "engaged in commerce or in the production of goods for commerce" in her capacity as an employee. 29 U.S.C. § 203(s)(1)(A)(i). Here, the Plaintiff has alleged that the Defendants are engaged in the operation of "family care homes" for adults who are frail due to age or who suffer from physical or mental infirmities such that they are unable to live by themselves. [Doc. 1 at ¶¶ 48, 50]. Section 203 of the FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as including an enterprise that "is engaged in the operation of ... an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution." 29 U.S.C. § 203(s)(1)(B). The Plaintiff has sufficiently alleged that Hodges and ALC constitute an "enterprise" within the meaning of that provision.

Accordingly, the Court concludes that the Defendants are subject to liability for violations of the minimum wage and overtime requirements of the FLSA.

## 2. Is Plaintiff a Covered "Employee"?

Next, the Court evaluates whether the Plaintiff qualifies as a covered employee under the Act.

The FLSA broadly defines "employee," with numerous exceptions not applicable here, to be "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "In determining whether a worker is an employee covered by the FLSA, a court considers the 'economic realities' of the relationship between the worker and the putative employer." Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 304 (4th Cir. 2006) (quoting Henderson v. Inter-Chem Coal Co., 41 F.3d 567, 570 (10th Cir. 1994)). "The focal point is whether the worker is 'economically dependent on the business to which [she] renders service or is, as a matter of economic reality, in business for [herself]." Schultz, 466 F.3d at 304.

In considering the economic realities of a plaintiff's employment, the Fourth Circuit applies the following factors: "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of

other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." Id. at 304-05.

The fact that an employer classifies an employee as an independent contractor or pays the employee a straight salary does not eliminate the need for a court to conduct the economic realities analysis. See Kennedy v. A Touch of Patience Shared Hous., Inc., 779 F. Supp. 2d 516, 521 (E.D. Va. 2011). Additionally, "[a] job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. Rather, an analysis of the "employee's salary and duties" is required to establish exempt status. Id.

While the Complaint contains several conclusory statements supporting the existence of an employer-employee relationship, there are sufficient factual allegations throughout the pleading to establish that the Plaintiff was an "employee" of the Defendants. Although she was classified as both an independent contractor and a supervisor, the Plaintiff in fact had a very limited degree of control in her position. She did not have any authority to supervise, fire, or hire other employees or to enter into contracts with third parties on behalf of her employers. She did not invest in any equipment or employ other workers. Her duties consisted of mainly manual

tasks lacking a high degree of skill.  Although the Plaintiff was employed at-will, she was employed for over three years, which indicates that her position was permanent.  For all of these reasons, the Court concludes that the Plaintiff has demonstrated that she was a covered "employee" within the meaning of the FLSA.

### 3.    Plaintiff's Damages Calculations

The Court next turns to the amount of unpaid wages to which the Plaintiff is entitled.  In the one sole paragraph of the Memorandum filed in support of the motion for default judgment which addresses the issue of damages, the Plaintiff explains her damages calculation as follows:

> Andrews was paid initially $550 per week for 167 weeks, then $600 per week for 14 weeks. That is a total of $100,250.00.  If she had been paid minimum wage for *all hours worked (19 per week)* she should have earned $138,034.05 regular time plus $48,260.02 overtime.  Minimum wage was $5.15 for 79 weeks, $5.85 for 53 weeks, and $6.55 for 49 weeks. This is a difference of $86,044.08.

[Doc. 78 at 1] (emphasis added).  The Plaintiff's reference to "19 hours per week" appears to be a typographical error.  It is evident from the spreadsheet that the Plaintiff submits in support of her damages calculation that she is claiming to have worked 133 hours *per week*, which calculates to working 19 hours *per day*.  [See Doc. 78-3].  Thus, it appears that the Plaintiff seeks

overtime pay under a theory that, as an employee who was required to reside on site, she worked 19 hours per day, seven days per week for a period of more than three years.

Due to the nature of certain job positions requiring that an employee be on duty for twenty-four hours or more, the FLSA and its accompanying regulations provide exemptions from overtime pay for certain activities depending upon the employee's living circumstances. In pertinent part, 29 C.F.R. § 785.23 provides as follows:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

29 C.F.R. § 785.23.

Recognizing the difficulty of determining the true number of hours "worked" by an employee who resides on site, "section 785.23 establishes a presumption that employees residing on the employer's premises are not working the entire time they are on the premises." Garofolo v. Donald B.

Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005); Jarrett v. ERC Properties, Inc., 211 F.3d 1078, 1082 (8th Cir. 2000) (discussing presumption that resident employees are not working the entire time they are on the job). The burden is on the employee to rebut the presumption established by § 785.23. Garofolo, 405 F.3d at 198.

Here, the Plaintiff has failed to present sufficient evidence to rebut the presumption established by § 785.23. While she alleges that she was required to reside at TLC all the time, and that she performed various duties for the residents there, she does not allege any facts with respect to how long it normally took her to perform such duties. She also does not make any factual allegations as to how she ate her meals or the amount of any personal or "down" time she had when not caring for residents.[5] Without such evidence, the Court must presume that the Plaintiff's working arrangement allowed her to have at least some time for eating, sleeping, entertaining, and other periods of relief from her required duties. See

---

[5] In fact, the Plaintiff alleges in her Complaint that she "generally worked around 168 hours in a week" [Doc. 1 at ¶ 118], which would mean that she engaged in work activity *twenty-four hours per day, seven days per week for the period of more than three years that she was employed by the Defendants.* In her Memorandum in support of her Motion for Default Judgment, the Plaintiff reduces this estimation to 133 hours per week, or 19 hours per day. [Doc. 78 at 1]. However, she still fails to provide any evidence to support a finding that her required duties took 19 hours per day to perform and precluded her from having any time for personal pursuits, meals, or sleep or more than five hours per night.

Garofolo, 405 F.3d at 200 (affirming summary judgment for employer when plaintiff presented "no evidence to suggest that they were working the entire time that they were present at the storage facility"); Myers v. Baltimore Cty., Md., 50 F. App'x 583, 587 (4th Cir. 2002) (affirming summary judgment for employer where there was "no indication that interruptions of private pursuits were frequent enough to render such time work time, that is, time spent predominantly for the benefit of [the employer]").

Presumably, the five hours per day for which the Plaintiff does not claim compensation is the approximate time that she could sleep at night without being interrupted. [See Doc. 1 at ¶ 111 ("Due to the requirement that plaintiff administer medication and the interruptions of residents/clients attempting to leave the premises, among other things, it was rare if ever that plaintiff received at least five (5) uninterrupted hours of sleep in any night.")]. The Plaintiff makes no allegations, however, and presents no evidence to explain how long these interruptions typically lasted, and there is certainly nothing in the record to suggest that she could not return to sleep after these interruptions. Given this lack of evidentiary support, the Plaintiff has failed to establish that she is entitled to overtime compensation for her overnight hours. See Kelly v. Hines-Rinaldi Funeral Home, Inc., 847 F.2d 147, 148 (4th Cir. 1988) (denying funeral employee overtime for overnight hours

during which he occasionally answered phone calls or had to pick up corpses, finding that plaintiff was "wait[ing] to be engaged" and therefore these hours were not working time).

Under the circumstances of this case, the Plaintiff has not alleged evidence which reasonably shows the amount of time she actually worked. While the parties apparently had no clear agreement regarding the nature of the Plaintiff's work hours or any periods of personal time or rest, it is simply a matter of common sense that the Plaintiff could not have sustained a work schedule of nineteen hours per day, seven days per week, for over three years. See Kelly, 847 F.2d at 148 ("While there was no clear agreement between the parties on the exact nature of the time in question, practical considerations guide us to conclude that [plaintiff] waited to be engaged .... [I]t is not realistic to assume that [defendant] would employ someone for 69 hours per week, thereby incurring large overtime expense, to perform the tasks assigned to [plaintiff]").

Accordingly, the Court concludes that the Plaintiff is entitled to compensation at the applicable minimum wage rate for forty hours per week. As for amount of overtime worked, the Court finds that the Plaintiff is exempt from overtime for eating, rest, and sleep time hours of at least twelve hours per day (eight hours for sleep and four hours for meals and rest periods).

The Plaintiff's overtime compensation, therefore, will be calculated based on a total of forty-four (44) overtime hours of per week. Accordingly, the Court will award the Plaintiff unpaid minimum wage and overtime payments as follows:

**Applicable Minimum Wage**

| | |
|---|---|
| $5.15 x 40 hours x 79 weeks = | $ 16,274.00 |
| $5.85 x 40 hours x 53 weeks = | $ 12,402.00 |
| $6.55 x 40 hours x 49 weeks = | $ 12,838.00 |

**Overtime (1.5 x applicable minimum wage)**

| | |
|---|---|
| $7.73 x 44 hours x 79 weeks = | $ 26,869.48 |
| $8.78 x 44 hours x 53 weeks = | $ 20,474.96 |
| $9.83 x 44 hours x 49 weeks = | $ 21,193.48 |
| Gross Compensation Owed | $110,051.92 |
| Compensation Received | <u><100,250.00></u> |
| **Net Compensation Owed** | **<u>$    9,801.92</u>** |

The Plaintiff will also be awarded an additional amount of $9,801.92 in liquidated damages. <u>See</u> 29 U.S.C. § 216(b).

**C.    Award of Attorneys' Fees and Costs**

The FLSA mandates an award of reasonable attorneys' fees and costs to a prevailing employee. <u>See</u> 29 U.S.C. § 216(b). While an award of fees

and costs is mandatory, the amount of such fees are within the Court's sound discretion. <u>Burnley v. Short</u>, 730 F.2d 136, 141 (4th Cir. 1984).

In determining the amount of reasonable attorneys' fees to be awarded, courts typically apply the lodestar method, whereby the Court multiplies the number of reasonable hours expended by a reasonable hourly rate. <u>See</u> <u>Robinson v. Equifax Info. Servs., LLC</u>, 560 F.3d 235, 243 (4th Cir. 2009). In determining the lodestar amount, the Court must consider the twelve-factor test set forth in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714, 717-19 (5th Cir. 1974), <u>overruled on other grounds</u>, <u>Blanchard v. Bergeron</u>, 489 U.S. 87 (1989), as adopted by the Fourth Circuit Court of Appeals in <u>Barber v. Kimbrell's Inc.</u>, 577 F.2d 216, 226 (4th Cir. 1978). <u>See</u> <u>Grissom v. The Mills Corp.</u>, 549 F.3d 313, 320-21 (4th Cir 2008). Those factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom, 549 F.3d at 321 (quoting Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987)).  After calculating the lodestar amount, the Court then should subtract fees for time spent on unsuccessful claims which were unrelated to successful ones.  Jackson v. Estelle's Place, LLC, 391 F. App'x 239, 241 (4th Cir. 2010).  Once the fees for unsuccessful claims have been subtracted, the Court should then "award[ ] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."  Id. (quoting Grissom, 549 F.3d at 321).  The party seeking an award of attorneys' fees has the burden of demonstrating a reasonable fee. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

Currently, the Plaintiff is represented by three attorneys: Joseph H. Cassell of the Eron Law Office in Wichita, Kansas; Terry D. Smith of the Law Office of Terry D. Smith in Wichita, Kansas; and John C. Hunter of the John C. Hunter Law Firm in Asheville, North Carolina.  Both Mr. Cassell and Mr. Smith were admitted to practice *pro hac vice* before this Court.  Mr. Cassell served as lead counsel, and Mr. Hunter served as the Plaintiff's local counsel.  The Plaintiff has provided scant information upon which the Court can award attorneys' fees, and what has been provided is very difficult to decipher.  Mr. Cassell gives no explanation of his claim for fees, but merely

attaches six pages showing some expense records and hours worked. [Doc. 78-4]. From this it appears that the Plaintiff claims $26,094.62[6] in attorneys' fees and $19,401.61 in costs. [Id. at 6]. This fees total, however, includes an entry in the amount of $7,425.62 from Mr. Cassell's prior firm, which amount includes other funds expended rather than fees. Therefore, the fees claim must be reduced by another $6,780.98 to reflect this. [Id. at 3]. This reduces the fees claim to $19,313.64. This, however, is still not the end of the calculation. The funds expended by Mr. Cassell and his firms include amounts paid to Mr. Hunter and his firms for services as local counsel. These are apparently part of the claim for fees. It appears the amount claimed for such is $8,553.23. Therefore, the Plaintiff appears to be claiming a total of $27,866.87 for fees and $17,629.36 for costs.

Absent from the Plaintiff's claim for fees, however, are any affidavits of counsel to explain their experience or their work on the case, and they offer no affidavits from other attorneys in the relevant legal community to establish the reasonableness of their requested fee. See Grissom, 549 F.3d at 321 ("In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant

---

[6] This is derived from what appears to be counsel's total claim of $45,496.23, which includes fees and counsel's total regarding expenses of $19,401.61.

community for the type of work for which he seeks an award.") (citation omitted). Further, the Plaintiff's attorneys have not provided any argument or citation to any legal authority in support of their request for fees and costs in the motion for default judgment. Of the twelve <u>Grissom</u> factors, counsel has provided scant information on one and no information on the others.[7] The lack of effort demonstrated by the Plaintiff's counsel makes the determination of a reasonable fee award extremely difficult in this case.

Mr. Cassell claims payment for 205.09 hours at an apparent average rate of $94.17 per hour. It is noted that many of Mr. Cassell's time entries have a notation at the right-hand margin stating "No Charge," which apparently lowered this hourly rate. As for Mr. Hunter's services, however, the Plaintiff has provided no explanation whatsoever as to what Mr. Hunter did, when such services were performed or the hourly rate charged.[8] The Court is left to guess as to all of these important factors.

The Court finds that a reasonable fee in this matter should be somewhat limited. The Plaintiff recovered only a small portion of what she

---

[7] The Court could glean information regarding the amount in controversy and results obtained (factor 8) from the record.

[8] The Plaintiff offers no evidence whatsoever regarding the services of Mr. Smith.

claimed.  As such, the Plaintiff was only partially successful in this suit.  In addition, the Plaintiff has prevailed by way of default, which should not have involved any great expenditure of attorney time.  The Court recognizes that this case involved three trips to the Court of Appeals, but those were occasioned by counsel's own tactical move of taking a voluntary dismissal of the suit he originally filed.  Lastly, since literally no information has been provided regarding the services performed by Mr. Hunter, the Court can only allow for the recovery for the most rudimentary actions by local counsel.  The Court cannot base an assessment of "reasonable fees" on assumptions of anything beyond that.  The Court notes that counsel appears to have reduced the claim for fees – presumably based on at least some of these factors – by indicating "No Charge" next to many of counsel's time entries.  Suffice it to say, counsel's submittal is completely inadequate for the Court to conduct the ordinary lodestar analysis.  Taking all of these factors into account, however, the Court will in its discretion award attorneys' fees in the amount of $20,000.00 and finds that such amount is reasonable.

Finally, the Court turns to the Plaintiff's request for an award of costs.  Courts have construed the term "costs of the action" as used in the FLSA to allow only the types of costs permitted by 28 U.S.C. § 1920.  See Uphoff v. Elegant Bath, Ltd., 176 F.3d 399, 411 (7th Cir. 1999) (interpreting Fair Labor

Standards Act) (cited with approval by <u>People for Ethical Treatment of Animals v. Doughney</u>, 263 F.3d 359, 371 (4th Cir. 2001) (discussing costs in the context of the Lanham Act)).  Section 1920 provides that the Court may tax as costs any of the following:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.  In awarding costs pursuant to § 1920, the Court is further guided by Local Civil Rule 54.1, which sets forth certain categories of costs that may or may not be awarded to a prevailing party. This Rule states, in pertinent part, as follows:

> **(F) Taxable Costs.** Items normally taxed include, without limitation:

(1) those items specifically listed on the bill of costs form. The costs incident to the taking of depositions (when allowable as necessarily obtained for use in the litigation) normally include only the reporter's attendance fee and charge for the original transcript of the deposition;

(2) premiums on required bonds;

(3) actual mileage, subsistence, and attendance allowances for necessary witnesses at actual cost, but not to exceed the applicable statutory rates, whether they reside in or out of this district;

(4) one copy of the trial transcript for each party represented by separate counsel;

(5) costs associated with private process servers;

(6) fees for service of summons, subpoena, and notices by private firms; and

(7) costs of the original videotape of a deposition and the appearance fee of a videographer in lieu of the costs of a transcript of the deposition.

**(G) Nontaxable Costs.** Items normally not taxed include, without limitation:

(1) multiple copies of depositions;

(2) daily copy of trial transcripts, unless prior Court approval has been obtained;

(3) copies of documents filed electronically; and

(4) attorney fees and attorney travel expenses;

(5) costs of shipping/mailing transcripts;

(6) costs for computer aided legal research including paralegal charges and computerized indices or optical discs produced for the benefit of counsel;

(7) costs associated with mediation;

(8) copy costs for any documents filed or served in electronic format;

(9) *pro hac vice* fees;

(10) costs for extraction and/or electronic configuration of data (emails) for the convenience of counsel absent any agreement among the parties pertaining to these costs; and

(11) costs associated with condensing a transcript, putting transcripts on a diskette or providing E-transcripts in addition to counsel receiving the original transcript.

LCvR 54.1.

The attachment to the Plaintiff's motion contain two lists of expenses. The third page contains a list of "costs" apparently incurred by Mr. Cassell in 2010 and 2011. Included in this list are a total of $90.37 for charges for long distance telephone calls, computerized legal research, and overnight delivery costs. [Id. at 3]. Also included as "costs" in this list are lump sum charges for "legal services by The Van Winkle Law Firm" in the amount of

$4,313.75,[9] and "Expert/Consultant Fee by Hunter & Carpenter, P.L.L.C." in the amount of $1,172.50.[10]  [Id.].   The total amount of "costs" claimed for this time period therefore are $6,816.62.[11]   The last page of billing records contains a list of claimed "expenses," apparently incurred by Mr. Cassell from 2011 to 2016, in the amount of $19,401.61.   These expenses include the "expenses/advances carried over from Redmond & Nazar" in the amount of $6,816.62,[12] as well as claims for postage ($99.50); filing fees ($910.00); costs of computer legal research ($292.39); overnight delivery charges ($53.98); copy expenses ($1,525.59); and attorney travel expenses related to oral argument ($790.30).   Also included in these "expenses" are various charges for "legal services" of local counsel referred to above.   [Id. at 6].

The recovery of several of these items is clearly prohibited under Local Civil Rule 54.1(G), such as fees for attorney travel expenses and computerized legal research.   Other claimed costs, while not specifically

---

[9] No attorney from The Van Winkle Law Firm, however, ever made an appearance on behalf of the Plaintiff in this case.

[10] Mr. Hunter was subsequently retained as local counsel, but this entry indicates that the services performed were something other than services of counsel to the Plaintiff.

[11] Some of these expenditures have already been addressed in the section pertaining to fees, see p. 24, *supra*.

[12] This amount appears to have been included in the $7,425.62 charge two pages earlier, and thus appears to be double counted in this claim.

addressed by § 1920 or the Local Rules, are similarly excludable, such as overnight delivery and other postage costs and long-distance telephone charges. See AM Props. v. Town of Chapel Hill, 202 F. Supp. 2d 451, 456 (M.D.N.C. 2002).

The Court will further disallow any claimed costs for which the Plaintiff has failed to provide an adequate explanation for the expense. See Andrade v. Aerotek, Inc., 852 F. Supp. 2d 637, 645 (D. Md. 2012) (denying costs where the "entries lack[ed] the basic level of detail sufficient for the court to understand the nature of the costs or why they should be granted"); Scallet v. Rosenblum, 176 F.R.D. 522, 525 (W.D. Va. 1997) ("In order to recover costs a party is required to provide explanation and adequate supporting documentation for the bill of costs."). Therefore, while the Court will award costs for the commercial printing of briefs for the Fourth Circuit ($723.95 and $568.59), the Court will not award costs for the additional $233.05 claimed in copy expenses when no explanation is provided as to why such additional expenses were necessary.

The Court, however, will allow the recovery of the fees incurred in filing two of the appeals to the Fourth Circuit Court of Appeals ($455 and $455),

as such filing fees are recoverable under § 1920.[13]  Accordingly, the Plaintiff will be awarded a total of $2,202.54 in costs.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Motion for Default Judgment [Doc. 77] is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the Motion [Doc. 77] is **GRANTED** to the extent that the Plaintiff Stella Andrews is hereby awarded $9,801.92 in compensatory damages, plus an additional award of $9,801.92 in liquidated damages against the Defendants America's Living Centers, LLC and Kenneth Hodges.  The Motion is **DENIED** with respect to the opt-in Plaintiffs Betty Gosnell, Sheila Barnard, and Sherry Hensley, and any claims purportedly asserted by these persons in this action are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff Stella Andrews is hereby awarded attorney's fees in the amount of $20,000.00 and an award of costs in the amount of $2,202.54 against the Defendants America's Living Centers, LLC and Kenneth Hodges.

---

[13] The Court notes that the Plaintiff does not seek to recover the costs of filing this action in the District Court in the first instance.

A Judgment consistent with this Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.** Signed: August 11, 2017

Martin Reidinger
United States District Judge